Vincent J. Kozakiewicz
Attorney at Law
4535 S. Five Mile Road
Boise, ID 83709
(208) 362-7965

W. G. Gilbert, III
Attorney At Law
15 South Idaho Street
P. O. Box 345
Dillon, MT  59725
(406) 683-6116

ATTORNEYS FOR PLAINTIFFS

FILED
BUTTE, MT

'06 APR 24  AM 10 52

PATRICK E. DUFFY, CLERK

BY _____
        DEPUTY CLERK

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF MONTANA

### BUTTE DIVISION

| | |
|---|---|
| JOSEPH R. RAMIREZ, JULIA L. RAMIREZ, JOSHUA RAMIREZ, and REGINA RAMIREZ, <br><br> Plaintiffs, <br><br> vs. <br><br> JEFF GROH, Special Agent with the Bureau of Alcohol, Tobacco and Firearms, <br><br> Defendant. | Cause No. CV 99-17-BU-SEH <br><br> PRETRIAL BRIEF |

Come now the above-named plaintiffs, by and through counsel and respectfully submit

this pretrial brief.

ISSUE 1: What is the causal connection between the act, the injuries and damages?

1

The only cause of action remaining after the appeal is the *Bivens* claim for the violation of the Fourth Amendment by defendant. Both the Ninth Circuit and US Supreme Court have held that defendant violated the Fourth Amendment and the defendant is not entitled to qualified immunity as a matter of law. Therefore, plaintiffs need only prove that the illegal search of their home caused each of them injury. The jury must decide what injuries were caused by the unconstitutional search and if they agree with plaintiffs, must determine the amount of damage.

The Fourth Amendment protects several interests. The Fourth and Fifth Amendments have both been described as protecting a right of privacy. This was discussed in *Griswold v. Connecticut*, 381 U.S. 479, 85 S. Ct. 1678, 14 L.Ed.2d 510 (1965) as follows:

> The Fourth and Fifth Amendments were described in *Boyd V. United States*, 116 U.S. 616, 630, as protection against all governmental invasions "of the sanctity of a man's home and the privacies of life."†
>
> †The court said in full about this right of privacy:
>
>> "The principles laid down in this opinion [by Lord Camden in *Entick v. Carrington*, 19 How. St. Tr. 1029] affect the very essence of Constitutional liberty and security. They reach farther than the concrete form of the case then before the court, with its adventitious circumstances; they apply to all invasions on the part of the government and its employees of the sanctity of a man's home and the privacies of life. It is not the breaking of his doors, and the rummaging of his drawers, that constitutes the essence of the offence; but it is the invasion of his indefeasible right of personal security, personal liberty and private property, where that right has never been forfeited by his conviction of some public offence, - it is the invasion of this sacred right which underlies and constitutes the essence of Lord Camden's judgment. 116 U.S., at 630.
>> *Id*. at 484, 485.

The Fourth Amendment violation in this case led to an invasion of Plaintiffs' most sacred liberty interest, the invasion of their indefeasible right of personal security, personal liberty and private property caused by the physical entry into their home without a warrant.

The Supreme Court recognized that the purpose of the particularity clause is not limited

to the prevention of general searches. "A particular warrant also 'assures the individual whose property is searched or seized of the lawful authority of the executing officer, his need to search, and the limits of his power to search." *Groh v. Ramirez*, 540 US 551, 561 (2004) The Court went on to reiterate its statement in *Illinois v. Gates*, 462, US 213, 236 (1983) that "[P]ossession of a warrant by officers conducting an arrest or search greatly reduces the perception of unlawful or intrusive police conduct." *Id.* at 561-562. Plaintiffs were also denied this protection of the Fourth Amendment.

The loss of all of these protections caused plaintiffs mental distress during and after the raid. In *Bivens*, the Supreme Court held, "Having concluded that petitioner's complaint states a cause of action under the Fourth Amendment, supra, at 390-395, we hold that petitioner is entitled to recover money damages for any injuries he has suffered as a result of the agents' violation of the Amendment." *Bivens v. Six Unknown Narcotics Agents*, 403 U.S. 388, 397 (1971). Therefore, fear, worry, loss of sleep, marital problems, shock, humiliation, embarrassment, distrust of law enforcement, damage to one blade of grass, footprints on the carpet, etc. are compensable injuries.

Damages for emotional distress in a civil rights case are not the same as in a tort claim for Intentional or Negligent Infliction of Emotional Distress. In *Memphis Community Sch. Dist. v. Stachura,* 477 U.S. 299, 307 (1978) the Supreme Court stated: "compensatory damages may include not only out-of-pocket loss and other monetary harms, but also such injuries as impairment of reputation, personal humiliation, and mental anguish and suffering." (Citation and internal punctuation omitted) The Court found error in instructing on presumed damages in addition to compensatory damages. The Court did not invalidate the instruction on

3

compensatory damages.  That instruction was as follows:

> You should consider in this regard any lost earnings; loss of earning capacity; out-of-pocket expenses; and any mental anguish or emotional distress that you find the Plaintiff to have suffered as a result of conduct by the Defendants depriving him of his civil rights.

The circuits have rejected the notion that intentional infliction of emotional distress standards should govern §1983 cases. See *Chatman v. Slagle*, 107 F.3d 380, 385 (6th Cir. 1997); *Chalmers v. City of Los Angeles*, 762 F.2d 753, 761 (9th Cir. 1985) amended on attorney fees, 808 F.2d 1376 (9th Cir. 1987); and *Walz v. Town of Smithtown*, 46 F.3d 162, 170 (2d Cir. 1995) (upholding $102,000 award of damages for emotional distress based solely on plaintiffs' testimony that they were "shocked" and "so upset ... that [one of them] started shaking.") (*cert. Denied*, ___ US ___, 115 S.Ct 2557, 132 L.Ed.2d 810 (1985).

The Ninth Circuit in *Chalmers* stated, " Chalmers testified at trial to the anguish, embarrassment, anxiety, and humiliation which she suffered.  The jury apparently believed her testimony." The Court refused to reverse the damage award. *Chalmers*, at 761.

Counsel for plaintiffs is unaware of any case that holds a plaintiff in a *Bivens* action to a higher standard than a plaintiff in a §1983 case. Both actions protect plaintiffs' constitutional rights. The difference is the authority under which the defendant was acting at the time, federal authority in a *Bivens* claim and under color of state law in a §1983 case.

Similarly, the Ninth Circuit has reversed the US District Court of Montana and "remanded with instruction that the district court award plaintiffs an amount which will fairly compensate them for these injuries," referring to humiliation and emotional distress in a §1982 claim. *Johnson v. Hale*, 940 F.2d 1192, 1193 (9th Cir. 1991) The court stated:

> Compensatory damages may be awarded for humiliation and emotional distress established by testimony or inferred from the circumstances. *Phiffer v. Proud Parrot Motor Hotel, Inc.*, 648 F.2d 548, 552-53 (9th Cir. 1980). No evidence of economic loss or medical evidence of mental or physical symptoms stemming from the humiliation need be submitted. *Seaton v. Sky Realty Co.*, 491 F.2d 634,

636 (7th Cir. 1974)

"The Court's failure to award compensatory damages for emotional distress was therefore clear error." *Id.* at 1194.

The Montana Supreme Court also has held that the tort standard of proof for the independent cause of action for infliction of emotional distress does not apply to civil rights cases brought pursuant to the Montana Human Rights Act. *Vortex Fishing Systems, Inc. v. Foss*, 2001 MT 312, 308 Mont. 8, 38 P.3d 836 (2001) and *Benjamin v. Anderson*, 327 Mont. 173, 112 P.3d 1039 (2005) ($75,000 award for emotional distress based on loss of self esteem, nightmares, and lack of motivation) So has the Alaska Supreme Court. See *Jones v. Department of Corrections*, 125 P.3d 343 (2005)

Plaintiffs' cause of action in this case is not brought pursuant to the Federal Tort Claims Act. The FTCA puts the US government in the place of its employee "if a private person would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346 (b)(1) See *Richards v. United States*, 369 US 1, 11 (1962) (holding that FTCA actions are governed by the law of the place where the act or omission occurred) and *Wilson v. US*, 190 F.3d 959 (9th Cir. 1999) However, a *Bivens* action is not governed by state tort law. "And our recent decisions regarding electronic surveillance have made it clear beyond peradventure that the Fourth Amendment is not tied to the niceties of local trespass laws. *Katz v. United States*, 389 U.S. 347 (1967); *Berger v. New York*, 388 U.S. 41 (1967); *Silverman v. United States*, 365 U.S. 505, 511 (1961). *Bivens v. Six Unknown Fed. Narcotics Agents*, 403 U.S. 388, 393-394 (1971)

The Supreme Court recognized that FTCA and *Bivens* are two different causes of action in *Carlson v. Green*, 446 U.S. 14 (1980) and stated the need for a uniform rule that applies to all federal actors in a *Bivens* action. "The question whether respondent's action for violations by

5

federal officials of federal constitutional rights should be left to the vagaries of the laws of the several States admits of only a negative answer in the absence of a contrary congressional resolution." *Id.* at 23.  Nor does the FTCA protect constitutional rights like a *Bivens* action. "Plainly FTCA is not a sufficient protector of the citizens' constitutional rights, and without a clear congressional mandate we cannot hold that Congress relegated respondent exclusively to the FTCA remedy." *Id.*  In fact the Federal Employees Liability Reform and Tort Compensation Act of 1988 specifically excludes claims "...brought for a violation of the Constitution of the United States,..." 28 USC 2679 (b)(2)(A).

Civil rights cases differ from FTCA cases.  In *Doe v. District of Columbia*, 796 F. Supp. 559, 573 (D.D.C. 1992) the Court noted that the plaintiff's "testimony established the emotional pain he endured from his rejection and the sense of isolation he felt from being singled out on the basis of his [disability]."  Based on the plaintiff's testimony, compensatory damages were awarded.  See also *Tanberg v. Weld County Sheriff*, 787 F. Supp. 970, 973 (D.Colo. 1992) (money damages warranted to compensate plaintiff for mental anguish where the plaintiff was discriminated against on the basis of his disability).

Similarly, in *Carter v. Duncan-Huggins, Ltd.*, 727 F.2d 1225, 1238 (D.C. Cir. 1984), the District of Columbia Circuit Court of Appeals affirmed a jury award of compensatory damages for the humiliation and other emotional harm that the plaintiff had endured after being discriminated against on the basis of her race.  The court noted that feelings of humiliation and isolation, albeit intangible, are cognizable and compensable injuries. *Id.*  The plaintiff's testimony that she "felt isolated," that her "mind just flew out" when she heard a racist anecdote, and that she was shocked by an accusation of incompetence was sufficient evidence to justify the jury

6

award. *Id.*

The decisions in *Doe* and *Carter* are fully consistent with other courts' interpretations of various civil rights laws. A number of circuit courts have held that emotional distress damages may be awarded in civil rights cases where the sole evidence of emotional injury is the plaintiff's testimony, and where there has been no overt or physical manifestation of such injury. See, e.g., *United States v. Balistrieri*, 981 F.2d 916, 931 (7th Cir. 1992) (plaintiffs' testimony that they felt "angry and upset," "hurt and disappointed," "disbelief and kind of a hurt feeling like feeling real sorry," and "surprised" sufficient to support emotional distress damage awards in Fair Housing Act case); *Johnson v. Hale*, 940 F.2d 1192, 1193-94 (9th Cir. 1991) (testimony that plaintiffs were acutely upset because they had been denied the opportunity to rent or inspect advertised rental units on the basis of their race and that they had begun to suspect that their white friends were racist sufficient to support emotional distress damage award in housing discrimination case); *Marable v. Walker*, 704 F.2d 1219, 1220-21 (11th Cir. 1983) (plaintiff's testimony in Fair Housing Act case that he had been embarrassed and humiliated by defendant's refusal to rent an apartment to him on the basis of his race sufficient to establish right to an evidentiary hearing regarding the amount of emotional distress damages that should be awarded); *Williams v. Trans World Airlines*, 660 F.2d 1267, 1272-73 (8th Cir. 1981) (specific proof of out-of-pocket losses or medical testimony not necessary to establish humiliation or mental distress in employment discrimination case arising under 42 U.S.C. § 1981; plaintiff's own testimony may be sufficient) *Seaton v. Sky Realty Co.*, 491 F.2d 634, 636 (7th Cir. 1974) (award for emotional distress upheld in housing discrimination case where only direct evidence of emotional distress was plaintiff's testimony that "I was humiliated. I was intimidated, not only as a person but as a man. He

7

stripped me of my right as a father to my kids."). Indeed, as the District of Columbia Circuit

Court of Appeals stated in *Hobson v. Wilson*, 737 F.2d 1, 62 (D.C. Cir. 1984), cert. denied, 470

U.S. 1084 (1985), a case arising under the civil rights conspiracy statute, 42 U.S.C. § 1985(3):

> the factfinder may measure plaintiff's testimony in light of the surrounding
> circumstances, and in proper circumstances award damages on the basis of
> plaintiff's testimony.  In reaching its conclusion, the court or jury may consider, as
> elements of compensable injury for emotional distress, humiliation and personal
> indignity, emotional pain, embarrassment, fear, anxiety, and anguish. (footnotes
> omitted)

Moreover, the argument that there must be an overt or physical manifestation of

emotional injury to warrant compensatory damages rests on an incorrect reading of *Carey v.*

*Piphus*, 435 U.S. 247 (1978).  In *Carey*, the Supreme Court held that mental anguish and

emotional distress are compensable injuries under § 1983.  435 U.S. at 263-64.  The Court

further held that substantial damages may be recovered only for the actual injury suffered, and

that the plaintiff must demonstrate injury to secure more than a nominal recovery.  *Id.* at 266.

Nevertheless, although the Court noted in a footnote that mental and emotional distress **"may** be

evidenced by one's conduct and observed by others," *Id.* at 264 n.20 (emphasis added), **nowhere**

**did it require** an overt or physical manifestation of emotional distress.  Rather, the Court stated

that, although a showing of actual injury is necessary, such injury can be proven by "showing the

nature and circumstances of the wrong and its effect on the plaintiff." *Id.* at 263-64.  See also

*United States v. Balistrieri*, 981 F.2d 916 at 930, 931-932 ( 7th Cir. 1992) Cert. denied 510 U.S.

812 (1993), citing *Carey v. Piphus*:

> [A] court may not presume emotional distress from the fact of
> discrimination.  A plaintiff must actually prove that he suffers from emotional
> distress and that the discrimination caused that distress.
> [I]n determining whether the evidence of emotional distress is sufficient to
> support an award of damages, we must look at both the direct evidence of
> emotional distress and the circumstances of the act that allegedly caused that
> distress.

The plaintiffs need only prove that they suffered emotional distress and it was caused by the unconstitutional entry into their home.

There is no requirement for the person whose constitutional rights were violated to actually be present during the illegal raid. As stated above, every citizen has an indefeasible right of personal security, personal liberty and private property. A burglary victim feels the loss of security even if they are not home during the burglary. And the impact on the victim is a consideration in sentencing the offender. Neither Joseph nor Joshua were home at the time of the raid. However, they still suffered damages as a result of the unconstitutional raid of their home. They, like Judy and Regina suffered fear of the officers returning to search for whatever they may have planted at the time of the illegal search. For example exhibit 202 quotes ATF officials saying the search was "all part and parcel to an ongoing investigation" and the article refers to the threat of arrest. These are some of the surrounding "circumstances of the act" causing the distress. They experienced and tolerated the mood swings of Judy, loss of sleep, embarrassment, humiliation, anger, fear, and worry. A person need not be home at the time of the raid to feel the loss of personal security and personal liberty. Presence at the time of the search has no effect on the loss of the assurances discussed in *Illinois v. Gates*, and the Ninth Circuit and US Supreme Court decisions in this case. Nothing in the Constitution requires a person to be at home in order for a violation to occur. If that were the case law enforcement officers could wait until they knew the homeowner was gone and search even without a warrant, leaving no recourse for the innocent homeowner. The Founding Fathers recognized the inherent damage to persons whose homes are invaded by unwanted persons when they founded this nation.

> Vivid in the memory of the newly independent Americans were those general warrants known as writs of assistance under which officers of the Crown had so **bedeviled the colonists. The hated writs of assistance** had given customs officials blanket authority to search where they pleased for goods imported in violation of the British tax laws. They were denounced by James Otis as "**the worst instrument of arbitrary power,** the **most destructive of English liberty**, and the fundamental principles of law, that ever was found in an English law book," because they placed "the liberty of every man in the hands of every petty officer." The historic occasion of that denunciation, in 1761 at Boston, has been

characterized as "perhaps the most prominent event which inaugurated the resistance of the colonies to the oppressions of the mother country. `Then and there,' said John Adams, `then and there was the first scene of the first act of opposition to the arbitrary claims of Great Britain. Then and there the child Independence was born.'" *Boyd v. United States*, 116 U.S. 616, 625.

But while the Fourth Amendment was most immediately the product of contemporary **revulsion against a regime of writs of assistance**, its roots go far deeper. Its adoption in the Constitution of this new Nation reflected the culmination in England a few years earlier of a struggle against oppression which had endured for centuries.

*Stanford v. Texas*, 379 U.S. 476, 481-82 (1965) (emphasis added) The Ramirez family are just as angered by the invasion of their home by government agents as the colonists were by "officers of the Crown." "But the Fourth and Fourteenth Amendments guarantee to John Stanford that no official of the State shall ransack his home and seize his books and papers under the unbridled authority of a general warrant - no less than the law 200 years ago shielded John Entick from the messengers of the King." *Id.* at 486. The Ramirez family was denied that guarantee for which our Founding Fathers ceded from the Crown, and must resort to a jury trial to receive their remedy; compensation for their anger, revulsion, humiliation, embarrassment, etc.

The Ramirez family was subjected to the type of search that the Fourth Amendment was designed to guarantee would never happen again in this country. The Founding Fathers began this country with the principle that all power was vested with the people and the government received its powers as a grant from the people. Alexander Hamilton in The Federalist No: 84, May 28, 1788 recognized that the Constitution was founded on the power of the people and because it was a grant of power to the general government no specific bill of rights was needed. He stated:

It has been several times truly remarked, that bills of rights are in their origin, stipulations between kings and their subjects, abridgments of prerogative in favor of privilege, reservations of rights not surrendered to the prince. Such was the MAGNA CHARTA, obtained by the Barons, sword in hand, from King John. Such were the subsequent confirmations of that charter by subsequent princes. Such was the *petition of right* assented to Charles the First, in the beginning of his reign. Such also was the declaration of right presented by the lords and commons

to the prince of Orange in 1688, and afterwards thrown into the form of an act of parliament, called the bill of rights.  It is evident, therefore, that according to their primitive signification, **they have no application to constitutions professedly founded upon the power of the people, and executed by their immediate representatives and servants.  Here, in strictness, the people surrender nothing**, and  as they retain every thing, they have no need of particular reservations. "WE THE PEOPLE of the United States, to secure the blessings of liberty to ourselves and our posterity, do *ordain* and *establish* this constitution for the United States of America." Here is a better recognition of popular rights than volumes of those aphorisms which make the principal figure in several of our state bills of rights, and which would sound much better in a treatise of ethics than in a constitution of government. ...

...For **why declare that things shall not be done which there is no power to do?**

The Federalist Papers by Alexander Hamilton, James Madison and John Day, Edited by Garry Wills, Bantam Classic edition, 1988.  (Emphasis added) Thus, government agents (or as Hamilton states: "servants") have no authority to enter a home absent consent of the people.  The Fourth Amendment is a grant of power from the people to their servants to search, but only after strict compliance with the requirements of the Fourth Amendment.  In this case, it has already been decided by the nation's highest court that defendant, Groh led a search of the Ramirez home without strict compliance with the requirements of the Fourth Amendment.  The gravamen of this case is that the defendant illegally searched the home of plaintiffs.  They can and will demonstrate that they were damaged by the invasion of their home.  Defendant is wrong in his assertion that they must prove they were damaged solely by the failure of the warrant to describe the items to be seized.  When the Fourth Amendment is correctly viewed as a grant of power from the people to the government, the inescapable conclusion is that the invasion of plaintiffs indefeasible right of personal security, personal liberty and private property is the wrong to be remedied, regardless of any lame excuse the people's servant may proffer for his failure to strictly comply with the Founding Fathers' explicit requirements for exercising the power granted.  The Colonists hated the damages caused by general searches and granted the power to search our homes only under strictly limited circumstances.

ISSUE 2: May the Federal officer who, without a valid warrant, conducted and led a search of a private home introduce pictures taken while illegally in the home in a Federal Civil trial for damages brought by the home owners against the officer?

There are two reasons to exclude the pictures (exhibits 18-94) offered by defendant. First the pictures disclose the interior of plaintiffs home to persons without their permission, a new violation of their right to privacy. Second, the rationale for the judicially created exclusionary rule applies equally where the case is a civil action between private parties, one who obtained the pictures while committing a Fourth Amendment violation and the others who are victims of that violation.

The publishing of the pictures into the Court's public record amounts to a second invasion into the sanctity of the home. It allows persons to learn intimate details of the interior of their home without the home owners' permission or consent. The Court is committing the violation. As Justice Brennan stated in his dissent in *Leon*, exclusion is not really a judicially created remedy, but "a direct constitutional command." *US v. Leon*, 468 U.S. 897, 938 (1984) (Brennan dissenting) It is the Court creating the violation by disclosing intimate details of plaintiffs' home to additional strangers, jury, court observers, and anyone who looks at the court record. This is much different than the cases where the violation has already occurred and there is no new violation. For example, if contraband was found in an illegal search, introducing that contraband in a civil trial does not disclose intimate details of a person's home as do the pictures in this case. Plaintiffs committed no crime and the Court should not allow a second intrusion into their home.

Exclusion deters future misconduct by the offending agent, Jeff Groh.
The "Prime purpose" of the exclusionary rule, if not the sole one, "is to deter future police misconduct." *US V Calandra*, 414 U.S. 338, 347 (1974). See *US v. Peltier*, 414 U.S. 531, 536-539 (1975) cited in *US v. Janis*, 428 U.S. 433, 447 (1976). Likewise, one of the purposes of a *Bivens* action is deterrence, "...the Bivens remedy, in addition to compensating victims, serves a

12

deterrent purpose. See *Butz v. Economou*, supra, at 505." *Carlson v. Green*, 446 US 14, 21 (1980)

" In evaluating the need for a deterrent sanction, one must first identify those who are to be deterred. " *US v. Janis,* at 448. In this case the identical officer who committed the constitutional violation is the one who will be deterred from future misconduct by denying him the use of the pictures obtained during the illegal search. Exclusion of evidence obtained pursuant to an illegal search or seizure has been applied in civil contexts. It has been applied to forfeiture proceedings, *One 1958 Plymouth Sedan v. Commonwealth of Pennsylvania, PA.*, 380 U.S. 693 (1965), reversal of a contempt of court, *Silverthorne Lumber Co. V. United States*, 251 U.S. 385 (1920), a civil action to recover customs duties, *Rogers v. United States*, 97 F.2d 691 (1st Cir. 1938), tax assessment, *Pizzarello v. United States*, 408 F.2d 579 (2nd Cir. 1969) and in deportation hearings. See *Orhorhaghe v. INS*, 38 F.3d 488 (CA 9th 1994)

The Second Circuit in *Pizzarello* stated:

> The prohibition against unreasonable searches and seizures is directed at governmental action. Absent the exclusionary rule, the Government would be free to undertake unreasonable searches and seizures in all civil cases without the possibility of unfavorable consequences. In such a situation, while the matter has not yet been settled by the Supreme Court, it seems clear, even under a view of the law that most favorable to the Government, that evidence so obtained would be excluded.

*Pizzarello v. United States*, 408 F.2d 579, 586 (2nd Cir. 1969) The Court went on to declare the tax assessment invalid.

The First Circuit in *Rogers* stated:

> The government's position in the District Court and here is "that the illegality of the manner by which the evidence is secured is not material in a civil case". The defendant, on the other hand, contends that evidence obtained in violation of the Fourth Amendment...cannot be used at all, in a civil or criminal suit, and in support of his contention relies on Silverthorne Lumber Company v. United States 251 U.S. 385.

> In the Supreme Court the order adjudging the company and Frederick W. Silverthorne in contempt was reversed on the ground that the government could not use knowledge that it had illegally gained by seizure of the original papers "to

13

call upon the owners in a more regular form to produce them"; that, if it could, it would be to reduce "the Fourth Amendment, U.S.C.A. Const. Amend. 4, to a form of words;" that "the essence of a provision forbidding the acquisition of evidence in a certain way is that not merely the evidence so acquired shall not be used before the court, but that it shall not be used at all", —even as a means for drafting subpoenas describing the papers sought to be produced.

If a writ of subpoena is rendered invalid because of the use in framing it of evidence obtained by the government in violation of the Fourth Amendment, we think that a judgment in a civil cause, in the procurement of which evidence thus illegally obtained is used, is likewise rendered invalid.

The court erred in admitting the evidence illegally obtained.

*Rogers v. United States*, 97 F.2d 691, 692 (1ˢᵗ Cir. 1938)

The application of the exclusionary rule is restricted to those areas where its remedial objectives are thought most efficaciously served. 31 CJS § 253 citing *Janis*. The test appears to be whether the deterrent effect of the sanction outweighs the cost to society of suppressing relevant evidence. *Tirado v. C.I.R.*, 689 F2d 307 (2ⁿᵈ Cir. 1982), cert. denied 460 U.S. 1014. In this case there is no cost to society because this case is between the violator of the Fourth Amendment and the victims of that violation. The rule in the Ninth Circuit is that evidence shall be excluded if that evidence was "'obtained by deliberate violations of the fourth amendment or by conduct a reasonable officer should know is in violation of the Constitution.' *Adamson*, 745 F.2d at 545 (citing *Lopez-Mendoza*, 468 U.S. at 1050-51, 104 S.Ct. At 3489-90)" *Orhorhaghe v. INS*, 38 F.3d 488, 493 (CA 9ᵗʰ 1994) The Ninth Circuit and the US Supreme Court have already determined that defendant, Groh should have known that he could not serve a warrant that failed to meet the particularity clause.

ISSUE 3: Are the newspaper articles offered by plaintiffs admissible?

Generally newspaper articles are not admissible under the hearsay rule. However, they are not being offered for the truth of the matters asserted therein. Thus, they are not hearsay. In *Watham v. U.S.*, 527 F.2d 1191 (Ct. Cl. 1975) newspaper articles reporting a fatal shooting of a human being by an IRS agent were not hearsay to the extent that they established that the shooting brought discredit on the IRS. The articles in this case are offered to show that it is more

probable than not that the plaintiffs experienced emotional distress.  Exhibit 201 mentions the letter from the bank asking them to close their accounts. Exhibit 202 has an ATF spokesman stating that the search is "...all part and parcel to an ongoing investigation" that substantiated plaintiffs' worry along with the talk of arrests if something comes from the investigation. Exhibit 203 supports Judy Ramirez's claim of fear and also by going public in this article it shows their attempt to mitigate their damages.

Exhibits 206 and 207 will not be used in plaintiffs' case in chief, but are necessary to impeach defense witnesses by demonstrating their cavalier attitude toward the constitution by the former sheriff and his officers.  Similarly, Exhibit 209 will be used to demonstrate the embarrassment and humiliation felt by the plaintiffs and may be used to impeach a defense witness, a law enforcement officer whose father was in charge of the Dillon, MT branch of the Norwest bank at the time.   Plaintiffs contend that if the IRS can use newspaper articles at trial to show that the shooting brought discredit to the IRS, plaintiffs should be able to use newspaper articles to show their emotional distress and humiliation from an unconstitutional raid of their home.

ISSUE 4: Plaintiffs' Objections to Defense Exhibits

**Exhibits 2 and 4** -The US Supreme Court and the Ninth Circuit have already ruled these are not relevant in this case.  These were placed under seal by Magistrate Holter and since they were not attached nor referenced in the warrant had no bearing on the warrants validity. The attempt to admit these items is an attempt to resurrect the issues of qualified immunity, good faith, and whether there was a Fourth Amendment violation.  Defendant has already lost those arguments in both the Ninth Circuit and US Supreme Court.  Additionally, they contain hearsay and open up issues that are irrelevant.  Plaintiffs have never conceded that there was probable cause for the issuing of the warrant.  They have maintained all along that probable cause is irrelevant in this case.  It is no more relevant than whether the warrant was signed by the

magistrate or sworn by oath or affirmation by the officer. The appellate courts have agreed with that position in holding as they did. The introduction of these documents would distract the jury from the real issue and immensely lengthen the trial on irrelevant matters. Defendant would dwell on all the reasons to conduct the search and plaintiffs would be forced to attack probable cause needlessly.

**Exhibits 5, 7, and 11** - These also contain information obtained as a result of the illegal search and are inadmissable for the second reason given above for the pictures. Exhibits 5 and 7 also contain hearsay and 7 contains inadmissable evidence of other acts that have no bearing on this case. Evidence of prior alleged wrongful acts is admissible only if the prior acts are similar and close in time to be relevant, the evidence of the prior acts is clear and convincing, and the probative value of the evidence outweighs any potential prejudice. *US v. Herrera-Medina*, 609 F.2d 376 (9th Cir. 1979)

**Exhibit 8** - Has no relevancy to this case. There was no 40 mm high explosive M397 found. This is another attempt by defendant to make probable cause an issue.

**Exhibit 9** - Has no relevancy to this case. It is hearsay information that has no probative value to the issues in this case.

**Exhibit 10** - Has no relevancy to this case. This is more hearsay that is not relevant. This exhibit is yet another attempt by defendant to resurrect good faith, qualified immunity, and no constitutional violation defenses that have already been denied.

**Exhibits 12-17** - These are all hearsay statements that have no relevancy. These exhibits are yet another attempt by defendant to resurrect good faith, qualified immunity, and no constitutional violation that have already been denied. Exhibits 12 and 16 also contain inadmissable evidence of other acts.

**Exhibits 1 and 6** - These have no relevance to this case. The drawings of the ranch and a firearm will not help the jury decide if the illegal search caused plaintiffs damage.

**Exhibits 95-113** - None of these are relevant to the issue of the damage caused to plaintiffs from

16

the illegal search of their home. Additionally, they all contain inadmissible evidence of other acts and are hearsay. Exhibits 97-112 also are inadmissible statements of reputation or character that have no bearing on plaintiffs truthfulness. These are all a subterfuge to resurrect the three lost defenses of qualified immunity, good faith, and no constitutional violation.

ISSUE 5: Are Plaintiffs entitled to Attorney Fees?

Counsel for plaintiffs concede that there is no authority to claim attorney fees in a *Bivens* action. It is the only area where a *Bivens* action differs from a § 1983 action because § 1988 specifically provides for attorney fees in appropriate circumstances. However, counsel for plaintiffs will seek attorney fees pursuant to the Equal Access to Justice Act if the US Attorney's Office takes a position at trial or any appeal that is not "substantially justified." (28 USC § 2412) For example, claiming that there was no Fourth Amendment violation or that defendant is entitled to qualified immunity or a "good faith" defense is not substantially justified in light of the Ninth Circuit and US Supreme Court decisions in this case.

Respectfully submitted this 21ˢᵗ day of April, 2006.

_____
Vincent J. Kozakiewicz
Attorney for Plaintiffs

## CERTIFICATE OF SERVICE

The undersigned certifies that he is a person of such age and discretion as to be competent to serve papers.

That on the 21ˢᵗ day of April, 2006, he served a copy of the attached by placing said copy in a postpaid envelope addressed to the person(s) hereinafter named, at the place(s) and

address(es) stated below, which is/are the last known address(es), and by depositing said

envelope and contents in the United States Mail at Boise, ID.

Addressee(s):

TIMOTHY J. CAVAN
Assistant U.S. Attorney
U.S. Attorney's Office
2929 Third Ave. North, Suite 400
P.O. Box 1478
Billings, MT 59103
Phone: (406) 247-4647


_____
Vincent J. Kozakiewicz